74 So.2d 371 (1954)
STATE ex rel. GUARDIAN CREDIT INDEMNITY CORP.
v.
HARRISON, Judge, et al.
Supreme Court of Florida. Division B.
July 23, 1954.
Rehearing Denied September 21, 1954.
*372 John G. Early, Sarasota, and Weldon G. Starry, Tallahassee, for petitioners.
Dexter & Conlee, Sarasota, for respondents.
HOBSON, Justice.
The matter before us arises upon a rule nisi in prohibition issued by this court at the suggestion of the State of Florida upon the relation of The Guardian Credit Indemnity Corporation ("Guardian"), an Ohio corporation, against the Honorable W.T. Harrison, as circuit judge, and two Florida corporations, Southern Supply Company, Inc., and Midcoast Wholesalers, Inc. The circumstances out of which this proceeding arose are the following:
Respondents, Southern Supply Company, Inc., and Midcoast Wholesalers, Inc., filed on October 15, 1953, a joint and several bill of complaint in chancery against Guardian alleging that they had each purchased from Guardian a "retail credit discount warranty". This "warranty" was allegedly sold to each plaintiff-respondent as a "contract or device to assure it in the collection of its delinquent accounts receivable". It was further alleged that Guardian had failed to carry out the terms of the warranties, to the injury of the plaintiffs. Declaratory and other relief was sought.
Service of process was first attempted on October 19, 1953, upon a local attorney, as resident agent of Guardian, but Guardian appeared and moved to quash this service for the reason that the local attorney had resigned as such resident agent on August 5, 1953. Upon the filing of this motion, the attempted service was abandoned.
Thereafter, on November 23, 1953, respondents sought to proceed against Guardian by serving the Honorable R.A. Gray, Secretary of State, as agent for service of process, under F.S. Sec. 47.16, F.S.A. Guardian again appeared for the purpose of contesting the service, and again moved to quash, this time on the ground that it (Guardian) had never engaged in a business or business venture in the State of Florida and that service upon it under F.S. Sec. 47.16, F.S.A., was invalid. Accompanying the motion was an affidavit of one George Hyde, president of Guardian. After a hearing, the circuit court denied Guardian's motion to quash and ordered Guardian to plead to the merits of the cause, whereupon the present writ was petitioned for.
To the Hyde affidavit is attached copies of the contracts or "warranties" with respondents, both entered on October 24, 1952, a typical contract between Guardian and one of its "brokers", and a copy of its corporate charter, which shows that Guardian is authorized to operate a collection service and do all things incident thereto. The affidavit asserts that the only offices of the *373 corporation are located in Painesville, Ohio, and that all of its officers and employees live in or near that city. Guardian was incorporated in 1949 and "from the date of its incorporation has operated a collection service * * *. Customers for this service include residents from most of the States of the United States." "Brokers" first began offering Guardian's service in Florida in 1950. "In every case where such contracts have been entered into between the Guardian Credit Indemnity Corporation and Florida parties, the contracts have been made in Ohio, the application being taken in Florida by Brokers and then forwarded to Ohio for acceptance or rejection."
Guardian was licensed to do business in Florida on July 28, 1952, the affidavit continues, and on the same date a resident agent was appointed. The affidavit contains the flat statement that the corporation "did no business in Florida in 1952 or in 1953", but this, of course, is a bare and ineffective conclusion on an issue which the trial court resolved against Guardian. The affidavit, after stating that no officers, employees or agents of Guardian were in Florida in 1952 or 1953 in the "line and scope of their employment" next describes Guardian's method of obtaining Florida "clients", asserting that this is accomplished through "brokers" as many as ten or twelve of whom have worked in this state. These "brokers" receive no salary or expense account, derive their compensation from commissions, provide their own automobiles, and devote as much or as little time as they like to obtaining applications. The company furnishes the "broker" with "instructions and supplies" by the use of which he is to present the company's "Credit Indemnity Plan" to prospects.
Although it cannot be a controlling factor because service in this case was made upon the Secretary of State, cf. Mason v. Mason Products, Inc., Fla., 67 So.2d 762, it is perhaps worth observing that it is unrealistic to think of these "brokers" as other than commission salesmen, as the specimen contract attached to the affidavit makes clear. The terms and conditions of their business activity in "soliciting" for Guardian were carefully prescribed by Guardian. The fact that they are referred to as "brokers" does not make them independent contractors, completely detached from company responsibility or control. When they were engaged in following the company's instructions in presenting its "Credit Indemnity Plan" to prospects, including the plaintiff-respondents, they were agents of Guardian, acting in the "line and scope of their employment".
The Hyde affidavit concludes as follows:
"The Guardian Credit Indemnity Corporation has never had any office telephone or other directory listing in Florida. The Company has never had a mailing address or letter box in Florida. It had not advertised for business in Florida. It has never had any books or records in Florida. The sole husiness of The Guardian Credit Indemnity Corporation is its collection service. This collection service does not involve sending agents or employees of The Company into Florida. Such an expensive method of collection would be impossible under the rates charged for the collection service. The service consists of giving the creditor certain form letters to use in making a demand for payment, these forms having proved helpful in getting payments from delinquent debtors. If the creditor uses this form letter without effect the creditor is asked to send full details concerning the account to the company's offices in Painesville, Ohio. On the receipt of this information in Ohio, the company by letter written in and mailed from Painesville, Ohio introduces itself to the debtor and makes demand for payment on behalf of the creditors. If this contract letter fails, other letters are sent which are written in and mailed from Painesville, Ohio. Naturally, this collection service is not 100% effective but in countless instances the service provided by The Guardian Credit Indemnity Corporation has been of value in collecting all or part of delinquent accounts. In no instance has the collection *374 service involved the use of agents of the Company in Florida to contact a debtor personally and in no instance has the Company employed individuals to process the accounts in Florida."
On the pleadings and the above affidavit, including, of course, the "warranty" between the parties, (and because of the view we take of the case we shall reserve consideration of this "warranty" until later in this opinion) the chancellor found that Guardian had "engaged in a business venture within the State of Florida", and that the service upon the Secretary of State was accordingly valid.
The question we must determine is whether or not the chancellor's decision that he had jurisdiction to try this cause was error. Burkhart v. Circuit Court of Eleventh Judicial Circuit, 146 Fla. 457, 1 So.2d 872; Crill v. State Road Dept., 96 Fla. 110, 117 So. 795; Curtis v. Albritton, 101 Fla. 853, 132 So. 677.
Guardian contends that mere solicitation of business by a foreign corporation in the forum state is not sufficient activity upon which to base substituted service. This is the "mere solicitation rule", established in People's Tobacco Co. v. American Tobacco Co., 1918, 246 U.S. 79, 38 S.Ct. 233, 62 L.Ed. 587, upon which Guardian places its principal reliance. Guardian asserts that our sanction of the chancellor's finding in the present case will represent a departure from a long line of cases which adhere to the "mere solicitation rule" and which have never been overruled by the Supreme Court of the United States. These cases include Cannon v. Time, Inc., 4 Cir., 1940, 115 F.2d 423, also relied upon by Guardian.
Respondents, on the other hand, contend that the controlling question is whether or not the record in this cause discloses facts in addition to the solicitation of business sufficient to hold that Guardian has engaged in a business venture in Florida as contemplated by F.S. Sec. 47.16, F.S.A. They rely upon International Harvester Co. v. Kentucky, 1914, 234 U.S. 579, 34 S.Ct. 944, 58 L.Ed. 1479 and International Shoe Co. v. Washington, 1945, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95, among other cases, and the latter case they regard as controlling because of the similarity of its facts with those before us. They point out that in International Shoe, four years of activity were under consideration, eleven to thirteen salesmen were involved, no contracts were made within the forum state, no office was maintained there, salesmen were local residents, salesmen were paid commissions only, salesmen's authority was limited to mere solicitation, orders were sent out of the state for acceptance or rejection, and prices and terms were fixed by the foreign corporation. Guardian seeks to distinguish the case on the ground that the local salesmen were under the supervision and control of sales managers at the principal place of business, and on occasion the salesmen rented rooms for exhibiting samples, for which they were reimbursed by the company.
Both arguments thus assume that there has been no significant development in this area of the law since the People's Tobacco case, cited above, was decided, and if this assumption were in our opinion correct, we would devote more space to a determination of whether or not the facts of this case are close enough to those in the International Shoe case to be controlled thereby. But our research has convinced us that the International Shoe case and the case of Travelers Health Association v. Virginia, 1950, 339 U.S. 643, 70 S.Ct. 927, 94 L.Ed. 1154 represent a change in theory from previous pronouncements on the subject by the Supreme Court of the United States, and that this newer approach must be taken in the case before us.
We shall first say a word about People's Tobacco Co. v. American Tobacco Co., supra, 246 U.S. 79, 38 S.Ct 233, 62 L.Ed. 587, to relate the statutory considerations implicit in that case with the wording of our own statute. The People's Tobacco case concerned an antitrust treble damage action arising under the Sherman Act, which provided for suit only "in the district *375 in which the defendant resides or is found". Act of July 2, 1890, ch. 647, 26 Stat. 209, 15 U.S.C.A. §§ 1-7, 15 note. The Supreme Court held that a foreign corporation could not be sued locally unless it was present in the district by its officers and agents so as to be "found" there, and that mere solicitation by salesmen within the district was insufficient to support the inference that the corporation had subjected itself to local jurisdiction. Dissatisfied with this restrictive holding, see U.S. v. National City Lines, 1948, 334 U.S. 573, 68 S.Ct. 1169, 92 L.Ed. 1584, and 1949, 337 U.S. 78, 69 S.Ct. 955, 93 L.Ed. 1226, Congress enacted the Clayton Act, Section 12 of which enlarged Section 7 of the Sherman Act so that a corporate defendant could be sued not only where it "resides or is found" but also in any district where it "transacts business". Act of October 15, 1914, Ch. 323, 38 Stat. 730, 15 U.S.C.A. § 22. And in Eastman Kodak Co. v. Southern Photo Materials Co., 1927, 273 U.S. 359, 47 S.Ct. 400, 71 L.Ed. 684 the Supreme Court held that the words "transacts business" were a significant extension of the venue in antitrust cases, in that case authorizing suit against a New York corporation in a Georgia district even though the defendant corporation would not have been "found" there under the previous statute. At this point it is well to observe that the pertinent words of F.S. Sec. 47.16, F.S.A. which authorize substituted service are "operate, conduct, engage in, or carry on a business or business venture, in the State of Florida * * *" which are even broader than the words "transacts business" in the Clayton Act, and therefore were intended to reach considerably beyond the scope of the language of the Sherman Act which was before the court in the People's Tobacco case, as above indicated. See State ex rel. Weber v. Register, Fla., 67 So.2d 619 where we had occasion to construe the Florida Statute, and Mason v. Mason Products Co., supra, Fla., 67 So.2d 762, noting that in the latter case F.S. Sec. 47.16, F.S.A., was not involved, service having been there attempted upon one who had taken two orders for the products of a foreign corporation, and the contention having been made that this person was a "business agent" of the corporation.
The venue provisions of the federal antitrust laws received a further liberal interpretation in U.S. v. Scophony Corporation of America, 1948, 333 U.S. 795, 68 S.Ct. 855, 92 L.Ed. 1091 and after that case was decided it could no longer be contended that People's Tobacco was controlling on the subject of antitrust venue. As a parallel development, the "mere solicitation rule" was encountering difficulties of its own. A line of "solicitation plus" cases resulted, wherein it was held that only a very slight amount of activity in addition to solicitation was needed as a basis for jurisdiction. See Frene v. Louisville Cement Co., 1943, 77 U.S.App.D.C. 129, 134 F.2d 511, and cases therein cited. Cannon v. Time, Inc., supra, 4 Cir., 1940, 115 F.2d 423 dates from this period.
Finally, in 1945, the International Shoe case was decided by the Supreme Court, and from the opinion the intent to discard formal tests seems plain. The court stated:
"It is evident that the criteria by which we mark the boundary line between those activities which justify the subjection of a corporation to suit, and those which do not, cannot be simply mechanical or quantitative. The test is not merely, as has sometimes been suggested, whether the activity, which the corporation has seen fit to procure through its agents in another state, is a little more or a little less."
Stone, C.J., 326 U.S. at page 319, 66 S.Ct. at page 159.
The International Shoe doctrine adopts a test originally formulated by Judge Learned Hand in Hutchinson v. Chase & Gilbert, 2 Cir., 45 F.2d 139, in making relevant an "estimate of the inconveniences' which would result to the corporation from a trial away from its `home' or principal place of business * * *'", and it requires only that the corporation have such minimum contacts with the forum that the maintenance of suit against it there "does not offend `traditional notions of fair play and substantial justice'". International Shoe Co. v. Washington, supra, 326 U.S. *376 at pages 316, 317, 66 S.Ct. at page 158. In addition, two further questions are prescribed: whether the corporate activities within the forum have been continuous and systematic or only single or isolated acts, and whether or not the activities gave rise to the liabilities sued upon. The balancing of conflicting interests which the International Shoe case contemplates creates an impression of similarity with the considerations involved in the application of the forum non conveniens doctrine. See The Growth of the International Shoe Doctrine, 16 U.Chi.L.R. 523. That this impression is justified is borne out by the opinion of Mr. Justice Black, speaking for the court, in Travelers Health Association v. Virginia, supra, 1950, 339 U.S. 643, 70 S.Ct. 927, 94 L.Ed. 1154, a case which upheld jurisdiction of the State of Virginia over a Nebraska mail-order insurance corporation which had contended that it was not "doing business" in Virginia because all of its activities took place in Nebraska. Said the court:
"[I]f Virginia is without power to require this Association to accept service of process on the Secretary of the Commonwealth, the only forum for injured certificate holders might be Nebraska. Health benefit claims are seldom so large that Virginia policy holders could afford the expense and trouble of a Nebraska law suit. In addition, suits on alleged losses can be more conveniently tried in Virginia where witnesses would most likely live and where claims for losses would presumably be investigated. Such factors have been given great weight in applying the doctrine of forum non conveniens. See Gulf Oil Co. v. Gilbert, 330 U.S. 501, 508, 67 S.Ct. 839, 843, 91 L.Ed. 1055 [1062]. And prior decisions of this Court have referred to the unwisdom, unfairness and injustice of permitting policyholders to seek redress only in some distant state where the insurer is incorporated."
Black, J., 339 U.S. at pages 648-649, 70 S.Ct. at page 930.
To summarize, the Supreme Court of the United States has become convinced that the difficulty with a purely mechanical test in cases of this nature is that it diverts the attention of the court from the overall plan of operation of a defendant foreign corporation. Instead, such a test requires concentration upon individual criteria of "presence" within the forum state, which, when they are added up to fall above or below the line, result in making the case comparatively easy to decide, but may also result in real injustice to residents of the forum state who have dealt with the foreign corporation in good faith only to find, after becoming acquainted with many tailor-made "jurisdictional" facts of which they could not have been apprised when the business dealings sued upon were in progress, that the corporation has not been "present" in their home state at all, and they must therefore travel many miles to sue, or abandon the cause altogether. If the amount involved is small, the latter alternative is almost certain to be selected, as many foreign corporations habitually incurring only small individual liabilities well know. See Foreign Corporations  State Boundaries for National Business, 59 Yale L.J. 737.
As the Hyde affidavit affirmatively asserts, Guardian first began to offer its "service" in Florida in 1950. By July, 1952, its Florida operation was apparently of sufficient magnitude to convince its officers that it should qualify to do business in Florida, as it did. At least by 1952 and 1953, Guardian's activities in Florida were "continuous and systematic". Obviously the present lawsuit grew out of these activities, and it was timely filed, which is also a relevant point for consideration in a case of this nature. French v. Gibbs Corporation, 2 Cir., 1951, 189 F.2d 787.
Although we do not intend that the remarks which follow should be construed to affect the merits of the case, which are not now before us, we must, under the rules discussed above, next proceed to examine the pertinent parts of the obligation or "warranty" upon which suit is brought, and the nature of the suit itself, because of *377 their bearing upon the character of Guardian's Florida operations and the issue of whether or not these operations resulted in or necessarily contemplated such "minimum contacts" with Florida that it is reasonable to subject Guardian to the proposed trial here. In this connection it should be noted that the case stands differently from one involving an interstate sale of a manufactured article, mainly because of the problems of performance which the Guardian "warranty" raises. The "warranty" reads in part as follows:
"The Guardian Credit Indemnity Corporation Agrees to Pay
"To Southern Supply Co. Sarasota, Florida ******** Five Thousand ******* Dollars, ($5,000.00) which shall be the amount of this Warranty, which shall be in effect for a period of one (1) year, commencing the Twenty-Fourth day of October, 1952, and terminating the Twenty-Third day of October, 1953, subject to and in consideration of the representations and stipulations made in the Application by the Client, which is hereby hade a part of this Warranty, and upon the proper payment of the prescribed fees as heretofore provided for, and subject to the terms, conditions and stipulations as set forth on the within pages which are also made a part of this Warranty.
"The Benefits, Provisions and Stipulations printed or written by the Company on the following pages are a part of this Warranty.
"In Witness Whereof The Guardian Credit Indemnity Corporation has caused this Warranty to be executed on October 24, 1952 which is its date of issue.
/s/ B.M. Isbell /s/ C.M. Hyde
Secretary President
 /s/ R.F. Hetzel
 Registrar
"Conditions and Stipulations
"The Guardian Credit Indemnity Corporation (hereinafter referred to as the Company)
"Agrees to Pay the Applicant, who is the recipient of this Warranty (heretofore and hereinafter referred to as the Client) The Principal Sum of Money as designated and appearing on this Warranty.
"(a) The Principal Sum of money is to be paid to the Client by the Company upon the Company's receipt of and the processing of claims as hereinafter designated and described. Monies or credits thus accruing, whether through the Company or the Client, shall apply on the principal amount of this Warranty and shall be so credited.
* * * * * *
"(e) The Client agrees to allow the Company a charge and/or a Discount of Fifteen (15%) Percent of the Face Value of any Debtor's account or Note coming within the province of this Warranty. The Company agrees to immediately pay to the Client, without recourse to said Client, the Face Value of any Claim less Company's charges, subject to and approved by the Company for Discount.
* * * * * *
"5. All Monies Due Client to be Remitted by Company Immediately.
* * * * * *
"7. * * *
"(d) In the event a Debtor Disputes any indebtedness to the Client and/or where satisfactory settlement is not effected, the Debtor's account shall be considered In Dispute. Any such account shall either be returned to the Client without jeopardizing Client's right of equity in this, the Company's Warranty, or the Company shall, at Client's cost and direction, engage counsel of Client's choice to establish said claim."
From the first quoted parts of the above "warranty", absent paragraph 7(d) thereof, and indeed, from the very name of the "Guardian Credit Indemnity Corporation", it would appear without qualification that Guardian is an insurer of delinquent accounts, *378 which have been "processed", i.e., properly forwarded to it on its forms, that it will immediately remit to the client the face amount of the "processed" account, less a fifteen percent charge, and that it seeks only to be subrogated to the debt after "indemnity" has thus been made. This was in substance the understanding of plaintiff respondents, as alleged in their complaint.
Guardian now contends, however, as we have seen from the Hyde affidavit, that its only commitment is to supply or send form letters from Ohio. It is difficult if not impossible to understand how such a contention can be sustained in the face of the "warranty". But paragraph 7(d) of the "warranty", pertaining to accounts "in dispute", which would include accounts "where satisfactory settlement is not effected", poses real problems of construction, the principal one being whether it was intended severely to qualify or limit the obligation assumed by Guardian in the preceding paragraphs of the contract, or whether it was merely intended to prescribe a method for the enforcement of a right to which Guardian would have been subrogated after indemnity was made, rendering Guardian the real party in interest in any litigation which might be conducted against the debtor. Without resolving these problems, but with the observation that all ambiguities in the contract must be construed strictly against Guardian, we think it obvious that any collection service, to be of value, must specialize in "disputed accounts", and if counsel were engaged, as the contract contemplates, it would in almost every instance be local, i.e., Florida, counsel. Thus if Guardian is not an insurer, but a collection service, as Guardian's president asserts, it is utterly unrealistic to suppose that any effective performance under the contract could take place other than in Florida, where debtor and creditor are located. Moreover, it can be seen that the contract is of sufficient ambiguity to justify the introduction of parol evidence, and in this connection the testimony of the "broker", presumably a Florida resident, who presented the Guardian "Credit Indemnity Plan" to plaintiff-respondents under direction to follow the company's "instructions" may be very helpful, and so may the "instructions" themselves.
It thus appears from the above discussion, from the character and extent of the business done and the obligations incurred, and with due consideration for reasonable trial convenience, that Guardian must be regarded as having engaged in "a business or business venture" within the State of Florida, which now provides the proper and just forum for suit against it. The trial judge correctly disposed of the problem with which he was confronted.
We hold accordingly that the challenged service was and is valid and the rule in prohibition must be, and it is hereby, quashed and discharged.
ROBERTS, C.J., and THOMAS and DREW, JJ., concur.