688 So.2d 397 (1997)
Robert SEGAL and Linda Segal, Appellants,
v.
RHUMBLINE INTERNATIONAL, INC., f/k/a Rhumb Line, Inc., a Florida corporation, Russell Wakefield, an individual; and Hanspeter Buhler, an individual; and John Monroe, an individual, Appellees.
Nos. 94-2321, 94-3349.
District Court of Appeal of Florida, Fourth District.
February 12, 1997.
Rehearing and Rehearing Denied March 20, 1997.
*398 Gary R. Jones and Stephanie G. Kolman of Hickey & Jones, P.A., Miami, for appellants.
Nancy W. Gregoire, Thomas K. Gallagher and Shari J. Ronkin of Ruden, Barnett, McClosky, Smith, Schuster & Russell, P.A., Fort Lauderdale, for appellees.
Rehearing and Rehearing En Banc Denied March 20, 1997.

ON MOTION FOR REHEARING
WARNER, Judge.
We withdraw our prior opinion and substitute the following in its place.
The appellants, the Segals, timely appeal from a final summary judgment disposing of their complaint against appellees Buhler and Monroe in which they alleged fraud, negligent misrepresentation, and fraudulent conveyance. We agree that the trial court erred in granting summary judgment with respect to the counts for fraud and for fraudulent conveyance, but we affirm the granting of summary judgment on the count for negligent misrepresentation and the dismissal of appellee-Monroe from the suit.
This case arises from the 1988 sale and leaseback of a 42-foot yacht which was sold to the Segals by a subsidiary of Rhumb Line, Inc. Rhumb Line agreed to lease the vessel back from the Segals for seven and one-half years, thus covering essentially all of the sales price and maintenance expenses. The Segals carefully studied the company before completing their purchase and were assured that the company was in good financial condition. Shortly before the sale, Buhler purchased a majority of the stock of the company and became its chairman of the board. The Segals alleged that Buhler was aware of the representations being made to them by various company officials and knew about the transaction. Specifically, the Segals alleged that the sales staff represented to them that a group of investors headed by Buhler had infused large amounts of capital into the company to insure continued successful operations and that these representations regarding Buhler's investment and involvement were authorized, orchestrated, and promoted by Buhler, who himself published a letter confirming these representations. These representations were made to make the Segals believe that the company was capable of making the payments under the lease-back arrangement and thus to induce the Segals to purchase the vessel, which was overpriced. The representations were false, because Rhumb Line was actually a financially troubled company with cash flow problems. As a result of the misrepresentations, the Segals purchased the yacht and were subsequently damaged when Rhumb Line went out of business. The complaint also alleged a cause of action for negligent misrepresentation.
The claim of fraud in the inducement of the contract must start with a determination of what contract is being alleged to have been entered. It is axiomatic that in a summary judgment proceeding the movant must conclusively show the absence of any genuine issue of material fact and the court must draw every possible inference in favor of the party against whom a summary judgment is sought. E.g., Holl v. Talcott, 191 So.2d 40 (Fla.1966); Moore v. Morris, 475 So.2d 666 (Fla.1985). Summary judgment should not be granted unless the facts are so crystallized that nothing remains but questions of law. Moore, 475 So.2d at 668. Construction of a contract is ordinarily a question of law for the trial court provided that the terms used are unequivocal, clear, undisputed, and not subject to conflicting inferences. E.g., Langner v. Charles A. Binger, Inc., 503 So.2d 1362 (Fla. 3d DCA 1987). However, when the terms of a written instrument are disputed and rationally susceptible to more than one construction, an issue of fact is presented which cannot properly be resolved by summary judgment. Id.
It is not clear from the face of the various documents which purchase agreement of several controls this transaction. Prior to Buhler's acquisition, on May 11, 1988, Robert Segal and Sailboats South executed a document entitled "Vessel Marine Sales Agreement" along with a "Yacht Lease Agreement." Linda Segal does not appear to be a party to that agreement, nor is she named as a purchaser. Mr. Segal made deposits *399 toward the purchase price of a vessel on May 10 and May 19, 1988. On June 29, 1988, Buhler acquired the company. After Buhler's acquisition, however, two additional Vessel Marine Sales Agreements were executed. One was dated August 9, 1988, reflecting the signatures of Mr. Segal and Sailboats South, which does not list Linda Segal as a purchaser. A new lease agreement dated September 27, 1988, was entered into between Segal and Rhumbline, Inc. instead of Sailboats South. Segal testified that this was at his insistance to show that the new management, namely Buhler, stood behind the leasing program. Another agreement, dated November 11, 1988, reflects the signature of Linda Segal and Sailboats South, listing for the first time both Linda and Robert Segal as purchasers. The May, August, and November agreements vary as to signatories, purchasers, and net sale price, and none of the agreements contain a boat serial number. Consequently, the issue as to which of these agreements constitutes the operative contract is far from crystallized, and a review of the series of agreements together renders them susceptible to more than one interpretation as to the parties' intentions. Thus, contrary to the dissent, since the last purchase agreement was executed well after Buhler acquired the company, we cannot conclude as a matter of law that "the contract" was negotiated prior to Buhler's acquisition of the company, or that any representations were made to the Segals after the execution of "the contract" and, therefore, could not have been an inducement for the Segals' entry into "the contract." There remain genuine issues of material fact as to the parties' intent concerning the legal effect of each purchase and sales agreement, which renders summary judgment inappropriate. Langner.
Taken most favorably to the Segals for purposes of summary judgment, depositions showed that the company was financially troubled and that statements were made by the sales staff and company officers regarding Rhumb Line's condition and Buhler's involvement in the company prior to the execution of the November 11, 1988, sales agreement and prior to the November 19, 1988, closing. Specifically, representations were made that Buhler was investing large amounts of capital into the company, which appellants alleged was untrue. Segal even testified that he had received a "message from the Chairman," showing Buhler's picture, referring to him in connection with an international investor group and indicating that investment in the company was being made. The Segals admit that Buhler never spoke or corresponded with them directly but claimed that the printed message and other papers were sent to them as buyers with the intent to influence their decision to purchase and lease. However, one officer testified that when he questioned whether the company should go through with the sale of the yacht to the Segals, Buhler himself told the officer to go ahead and close the transaction. Segal alleges that they would not have purchased the yacht absent the allegations that Buhler and an international group of investors were investing large amounts of capital to insure continued successful operations.
Buhler maintains that he cannot be personally liable for the statements of other corporate officers and the staff. While we agree that he would not be liable for negligent misrepresentations simply because he was a corporate officer, see Munder v. Circle One Condominium, Inc., 596 So.2d 144 (Fla. 4th DCA 1992); Cottle v. Storer Communication, Inc., 849 F.2d 570 (11th Cir.1988), there may be individual liability where fraud is alleged. Munder, 596 So.2d at 145. In Nicholson v. Kellin, 481 So.2d 931 (Fla. 5th DCA 1985), the individual director of a corporation was sued for fraud even though the director had never met the plaintiffs/investors. Nevertheless, the complaint alleged that the director had orchestrated the false representations made to the plaintiffs and had also allowed his name to be associated with the representations made. The complaint alleged that the corporate directors were conspiring with others to defraud the plaintiffs. The fifth district held that the complaint stated a cause of action for fraud against the individual defendants, finding that the allegations were sufficient to implicate the individuals in the conspiracy. The court stated:

*400 A conspiracy is a combination of two or more persons by concerted action to accomplish an unlawful purpose or to accomplish some purpose by unlawful means. See Kent v. Kent, 431 So.2d 279 (Fla. 5th DCA 1983). Each act done in pursuance of a conspiracy by one of several conspirators is an act for which each is jointly and severally liable. 10 Fla.Jur.2d § 3, Conspiracy-Civil Aspects (1979). Here, Nicholson and Ariko [plaintiffs] alleged that Kellin misrepresented Polar Chips as a viable, profitable corporation which it was not and that these misrepresentations were made to defraud investors.... Nicholson and Ariko also alleged that the Lipshultzes acted in concert with Kellin and others to defraud potential investors such as themselves.... Under a conspiracy theory, the Lipshultzes would be just as liable as their co-conspirator, Kellin.
Id. at 935. The facts of Nicholson are strikingly similar to the instant case except for the lack of an express allegation that Buhler "conspired" with the corporate staff and the other officers of the corporation to defraud the Segals. Nevertheless, the allegations contain all of the necessary elements of a conspiracy. See Nicholson. Therefore, the allegations and the facts taken most favorably to the appellants show that there were genuine material issues of fact outstanding, and the trial court erred in granting summary judgment on the count alleging fraud. In reaching this conclusion, we have considered the other grounds Buhler has raised to support the summary judgment, and we reject them, finding that the record contains material issues of fact still to be resolved. With respect to Buhler's claim that the action is barred by the economic loss rule, we have already held that fraudulent inducement is an exception to the rule. TGI Dev., Inc. v. CV Reit, Inc., 665 So.2d 366 (Fla. 4th DCA), approved, 689 So.2d 255 (Fla.1996).
We also reverse the summary judgment granted for fraudulent conveyance.[1] The Segals alleged that Buhler had obtained a UCC security interest in the assets of Rhumb Line when he made various loans to the corporation in 1988. When the company dissolved, he obtained the assets, which the Segals alleged were substantially in excess of the value of the loans made by Buhler. Appellants sued as creditors of the corporation for the excess value of the assets transferred to Buhler over the loans due. On summary judgment, the trial court did not specifically rule on this count other than to indicate that to be consistent, it would "get Buhler out" on the summary judgment. While the Segals detail how there were material issues of fact on each essential element of the cause of action, Buhler's main argument is that the action was barred by the statute of limitations. The Segals had four years from the filing of the UCC statement or one year from discovery of the fraudulent transfer in which to bring suit. As the Segals testified that they did not discover the transfer until 1992 and within a year amended their complaint to allege a cause of action based on the transaction, there is an issue of fact as to whether the complaint was filed within the statute of limitations which cannot be resolved by summary judgment.
We affirm the summary judgment on the count of negligent misrepresentation. We also affirm the summary judgment dismissing appellee Monroe from the suit.
Reversed in part, and remanded for further proceedings.
PARIENTE, J., concurs.
FARMER, J., dissents with opinion.
FARMER, Judge, dissenting.
As I read the record, the facts either established or as to which the non-moving party could offer evidence are as follows:
1. appellants were induced by certain initial representations to enter into what ultimately became three separate contracts, with the initial representations that *401 formed the inducement for the transactions all occurring at the beginning;[2]
2. sometime after the initial inducement and after the first contract was formalized, a new shareholder, Buhler, took control of the corporation;
3. before closing on the contracts, a corporate officer who participated in inducing the contracts told Buhler that the corporation would probably have difficulty in meeting its primary contractual obligations at some point in the future; and
4. Buhler nevertheless decided that the closing should go ahead anyway and directed the officer to proceed with the closing.
Under the holding of the majority, these facts support a cause of action against Buhler for fraud in the inducement of the series of contracts which were induced before he came into the corporation and acquired any knowledge of the existence of the business dealings between plaintiffs and the corporation.
The majority cites no supreme court authority for its legal conclusion that the foregoing state a cause of action for fraud. They rather rely on Nicholson v. Kellin, 481 So.2d 931 (Fla. 5th DCA 1985). The facts in Nicholson are shown in the following paragraph from the fifth district's opinion:
"In the present case, Nicholson and Ariko alleged that Walter Kellin misrepresented the prospects of Polar Chips and its continuing viability by stating or implying that there existed guaranteed returns and profits as stated in the management contract. Nicholson and Ariko further alleged that Polar Chips was engaged in a `ponzi scheme' whereby it sold nonexistent ice machines and used those profits to pay investors on their management contracts. They also alleged, among other things, that McArthur, the president of Florida National Bank, had accepted bribes to promote Polar Chips. Nicholson and Ariko admitted that they had never met the Lipshultzes, but alleged that `the Lipshultzes fully acquiesced and helped orchestrate the representations made to Nicholson and Ariko by Kellin and also allowed Kellin to associate their names and personal involvement with Polar Chips.' Nicholson and Ariko further alleged that `all of the activities of Kellin, McArthur and M. Lipshultz which form the basis for Nicholson and Ariko's actions, were not only mutually consented to but were jointly determined and orchestrated by the Lipshultzes and Kellin to be performed or conducted by the individuals mentioned.' These allegations are sufficient to implicate the Lipshultzes in a fraudulent conspiracy."
481 So.2d at 935. I am unable to discern comparable facts in this case.
Buhler did not bribe a bank president to promote the contracts; he did not secretly plan to bail out of the corporation, while representing that he would continue to guide its affairs; the contracts here were not part of a "Ponzi scheme" to sell nonexistent yachts; and no one suggests that Buhler made, orchestrated, or even knew of the inducements to enter into the contracts in the first place. Thus even if the plaintiffs here proved everything they have alleged, they will not have proved a claim of common law fraud in the inducement, because they can show no conduct by Buhler, whether directly by himself or by orchestrating the actions of others, inducing anyone to enter into the contracts. Indeed the facts demonstrate without any suggestion to the contrary by appellants that Buhler came into the corporation after the contracts had already been inducedwhether fraudulently or otherwiseand that he did no more than direct the applicable corporate officer to proceed with the closing on it with knowledge that the corporation might have financial difficulty in performing after closing. There is no *402 similarity between these facts and those in Nicholson.
I must add that I do see a profound difference between a contracting party believing that it will have difficulty in performing its contract down the line, on the one hand, and a party contracting with an intention of never performing, on the other. Only the latter is even arguably actionable as fraud in the inducement. Commercial parties often contract knowing that the bargain may be hard but believing in good faith that circumstances will improve. That precise circumstance does not even remotely constitute fraudulent contracting with an intention of never performing. Yet, under the majority's decision, controlling officers or directors or shareholders of corporations who so contract will now be subject to suit for fraud if the corporation does business when the future seems gray and the portents dark. I believe that the majority's decision significantly alters the common law cause of action for fraud in the inducement and is capable of doing considerable damage to a wide range of commercial undertakings.
I also disagree with the majority's decision on the fraudulent conveyance count.[3] There is no contrary evidence to Buhler's showing that he lent money to the corporation and that his loan was secured by a security interest in certain property of the corporation. Giving a security interest to the lender under the circumstance here shown does not come close to creating a fraudulent conveyance.
There is undeniable consideration for the transfer-conveyance, and that consideration was contemporaneous and not antecedent to the debt. Moreover, it should hardly be surprising that the value of the collateral given exceeded the amount of the loan. What lender knowingly agrees to make a secured loan with collateral worth less than the amount of the debt so secured? A preference under federal bankruptcy law should not be confused, as the majority apparently does, with a fraudulent conveyance. I am unable to understand what contested fact requires a trial as to the claim of fraudulent conveyance.
In my opinion, the final summary judgment in favor of Buhler on these two claims should be affirmed.
NOTES
[1] In keeping with the standard of review on summary judgment our opinion expresses no position as to the merits of the fraudulent conveyance count. See Holl; Moore. The dissent's reasoning as to this count has gone well beyond the applicable standard of review to reach the merits.
[2] The majority's revised opinion now focuses on the fact that the second contract substituted the corporate parent for the subsidiary and added some equipment not included in the original. They say that "representations were made that Buhler was investing large amounts of capital into the company" but omit saying who made the representations. There is nothing in the record showing that Buhler made or orchestrated them. Indeed there is nothing suggesting that Buhler even knew of them. Moreover, the representation of Buhler's incipient investment in the company is not shown as being made to induce the purchase, other than the self-serving allegation years after the fact that they would not have done so without Buhler's investment in the company.
[3] I frankly do not understand how I can review a summary judgment in favor of a defendant on a fraudulent conveyance claim without undertaking to analyze the facts revealed in discovery in light of the pleadings. If that constitutes "going well beyond the applicable standard of review to reach the merits" I suppose I am guilty.