[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

Nos. 96-2222, 97-2473

D.C. Docket No. 83-CV-714

BIVENS GARDENS OFFICE BUILDING,
INC., JAMES A. KARNS, et al.,

Plaintiffs-Appellants.

versus

BARNETT BANKS OF FLORIDA, INC.,
BIVENS CENTER, INC., et al.,

Defendants-Appellees.

Appeals from the United States District Court
for the Middle District of Florida

**(May 4, 1998)**

Before COX and CARNES, Circuit Judges, and MARCUS[*], District Judge.

---

[*]Honorable Stanley Marcus was a U.S. District Judge for the Southern District of Florida sitting by designation as a member of this panel when this appeal was argued and taken under submission. On November 24, 1997, he took the oath of office as a United States Circuit Judge of the Eleventh Circuit.

CARNES, Circuit Judge:

Plaintiffs Fred Konstand, Elizabeth Blatenburger (as representative of the Estate of James Karns), and George Malick (both individually and as a partner in Malick Investment Company) appeal from the orders and judgments of the district court effectively extinguishing plaintiffs' RICO and state law claims arising out of the allegedly unlawful takeover, management, and sale of a hotel in which plaintiffs had various ownership interests during the period from 1975 to 1981. We hold that although the district court was correct to grant judgment in favor of the defendants on several of the claims, it erred in granting summary judgment on some of the RICO claims and on Konstand's state law shareholder derivative claim.

First, we affirm in part and vacate and remand in part the district court's dismissal of plaintiffs' RICO claims on standing grounds. Specifically, we hold that Konstand as a BCI creditor has standing to pursue one of his individual claims, and that Konstand and Karns have stated shareholder derivative claims for which they have RICO standing. On the other hand, the district court correctly ruled that the individual claims of Karns and Malick, as well as Malick's partnership derivative claim, could not be pursued under RICO. Second, we affirm the district court's denial of Malick's motion to amend and supplement the complaint. Third, we vacate and remand the district court's grant of summary judgment on Konstand's state law shareholder derivative claim. Fourth, we affirm the court's evidentiary rulings at trial  that excluded evidence of BCI's management of the Gainesville Hilton and its sale in 1981. Fifth, we affirm the district court's directed verdict in favor of the defendants on all

1

of the counts that reached trial, namely, Karns' state law shareholder derivative claim and the plaintiffs' civil conspiracy claim. Sixth, we affirm the district court's denial of postjudgment relief. Finally, we deny both plaintiffs' motion for attorneys' fees and defendants' motion for double costs. Accordingly, we affirm in part, and vacate and remand in part.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. THE FACTS[1]

In 1969, plaintiff Fred Konstand planned the development of forty acres of land in Gainesville, Florida. The development was to include a shopping center, condominiums, an office building, and a hotel. In furtherance of that plan, Konstand incorporated several entities, including defendant Bivens Center, Inc. ("BCI"). Konstand was originally the majority shareholder of BCI, and James Karns was the largest minority shareholder. BCI became the general partner of Bivens Gardens Hotel, Ltd. ("BGH"), a limited partnership formed to develop the hotel. BCI owned one-half of BGH, while the other half was owned by approximately twenty limited partners, including plaintiffs George Malick and Malick Investment Company (collectively "Malick"). BGH held title to the hotel built on the property, the Gainesville Hilton, from the time that it was built until it was sold in 1981. Konstand also formed Bivens Gardens Office Building ("BGOB") to develop the office building. That building, however, was never constructed.

---

[1]This factual summary is drawn largely from this Court's earlier opinion in this case, Bivens Gardens Office Bldg., Inc. v. Barnett Bank of Fla., 906 F.2d 1546, 1548-49 (11th Cir. 1990).

Konstand funded these ventures both through the sales of BCI shares and BGH limited partnerships, and through outside lenders. Guardian Mortgage Investors ("GMI"), a real estate investment trust, was a principal lender, lending money to both BGOB and BGH. Konstand and BCI also jointly borrowed $200,000 from defendant University City Bank ("UCB").[2] This loan was secured by a pledge of most or all of Konstand's stock in BCI.

On October 18, 1974, UCB sent Konstand a notice that the $200,000 loan was in default. The plaintiffs allege that on February 20, 1975, Robert Koons (then president of UCB) and Robert Lanzilotti (then chairman of defendant Barnett Bank and a BGH limited partner) went with UCB attorney Selig Golden to the home of Karns, and there obtained a fraudulent proxy from him.[3] That proxy was then used to remove the incumbent directors of BCI, and to replace them with new directors who, at the defendants' behest, ousted Konstand from the presidency and control of BCI. By installing their own directors, the defendants effectively gained control of both BCI and BGH.

The next day, February 21, 1975, UCB filed suit against Konstand and BCI in state court on the defaulted loan. UCB prevailed in state court, and obtained permission to sell the BCI shares that Konstand had pledged to secure the loan. UCB then bought those shares at the public sale for a price of $501. At this point, Konstand had clearly lost control of BCI; he was no longer president and owned (at most) only .93 share of BCI stock. UCB installed

---

[2]UCB subsequently became The Great American Bank of Gainesville, Inc. and is now part of defendant Barnett Banks of Florida, Inc.

[3]Koons and Lanzilotti were initially defendants, but plaintiffs consented to a voluntary dismissal of them.

defendant Lee Hanna as BCI president in 1975. Hanna, who served as president of BCI from 1975 to 1977, was 24 years of age in 1975; he was a UCB employee with no business experience, and he spent less than five percent of his work time on BCI matters.

On June 6, 1975, BGH filed for bankruptcy protection because it was unable to make interest payments on the mortgage held by GMI, the construction lender. While BGH was in bankruptcy from 1975 to 1981, UCB did not operate the hotel directly; instead it served as caretaker for the hotel. UCB hired two hotel management companies to manage the hotel during this time: International Hospitality Group from 1975 to 1976, and Heritage Management Company from 1976 until the sale of the hotel in 1981.

In April 1981, with the approval of the bankruptcy court, the hotel was sold as part of the reorganization of BGH. The plaintiffs claim that the sale was improper because the defendants secured the approval of the bankruptcy court by misrepresenting that BCI and BGH shareholders had approved the sale. Plaintiffs also contend that the defendants misrepresented the value of the hotel to the bankruptcy court, and they contend that it was sold for $1.5 million less than its fair market value.

## B. THE PROCEEDINGS TO DATE

The plaintiffs commenced this action on July 21, 1983. The first three counts of their complaint allege claims pursuant to the Racketeer Influenced and Corrupt Organization Act (RICO), 18 U.S.C. § 1961 et seq.. Count I sets forth the plaintiffs' three causes of injury--the takeover of BCI in 1975, the management of the hotel from 1975 to 1981, and the sale of the hotel in 1981. Count II then alleges that UCB violated RICO in causing these injuries by

4

engaging in a pattern of racketeering activity that included wire fraud, mail fraud, and bankruptcy fraud. Counts IV and V allege state law claims: a shareholder derivative count (Count IV) and a civil conspiracy count (Count V). By October 1988, all of the defendants had moved for summary judgment. On February 3, 1989, the district court entered summary judgment against all of the plaintiffs on all five counts on statute of limitations grounds. [R7-166, 167] The plaintiffs appealed from this judgment. [R7-171].

On July 31, 1990, this Court affirmed in part and reversed in part. See Bivens Gardens Office Bldg. v. Barnett Bank of Fla., Inc., 906 F.2d 1546 (11th Cir. 1990). In that decision, we held that the district court analyzed the plaintiffs' claims incorrectly insofar as it considered the complaint as a single RICO claim. Instead, we read the complaint as having alleged three distinct RICO injuries: (1) the takeover of BGH's hotel in 1975; (2) the alleged skimming of profits from the hotel from 1975 to 1981; and (3) the sale of the hotel in 1981 for less than its fair market value. See id. at 1551. We held that the earliest of these injuries--the 1975 takeover of the hotel--was time barred insofar as Konstand was concerned. See id. at 1556. We left the question of whether the first injury was time barred as to the other plaintiffs, as well whether any of the other injuries might be time barred with regard to any or all plaintiffs, for resolution by the district court. See id. at 1555-56, 1557 n.13. Accordingly, we affirmed the district court's grant of summary judgment against Konstand on that one claim, but reversed with respect to Konstand's other claims. We also reversed the district court's order insofar as it pertained to the other plaintiffs' claims. See id. at 1557.

5

On remand, the defendants again moved for summary judgment, contending mainly that the remanded claims were time-barred and that the plaintiffs lacked standing to bring RICO and shareholder derivative actions. Defendants then filed additional summary judgment motions raising a variety of arguments, but focusing on the statute of limitations and RICO standing issues. [R15-398]

While these motions for summary judgment were pending, Malick moved to amend the complaint to clarify the "derivative nature" of his claims in the RICO and civil conspiracy counts. The plaintiffs, including Malick, also moved to supplement the complaint to allege events concerning the sale of the hotel that had occurred after they filed the complaint. [R17-455]

By order dated August 3, 1993, the district court denied those motions to amend and supplement the complaint. As part of the same order, the court granted summary judgment against the plaintiffs on the RICO counts of the complaint (Counts I-III), primarily on the grounds that the plaintiffs lacked the standing to assert those RICO claims. The court also found that because Malick was not a shareholder in BCI, he could not recover damages for the second injury, the hotel mismanagement, under the civil conspiracy charge. Finally, the district court stated that the statute of limitations precluded Konstand's and Karns' claims based on the alleged wrongful takeover of BCI. Plaintiffs filed a motion for rehearing, contending that their RICO counts alleged shareholder/limited partner derivative claims sufficient to confer RICO standing. The court denied plaintiffs' motion for rehearing.

6

On September 17, 1993, the district court referred the case to mediation. Although the case was settled with respect to defendants Koons and Lanzilotti, who were dismissed (effectively extinguishing Count III of the complaint), the parties were unable to reach a complete agreement. When the remaining parties failed to reach a settlement, the district court set the case down for trial commencing on January 8, 1996.

On November 22, 1995, less than two months before the case was to go to trial, the defendants moved for summary judgment on the remaining counts. The defendants asserted that because Konstand and Karns did not own any BCI stock, they were precluded from bringing a shareholder derivative action. The district court agreed with respect to Konstand and dismissed his claim under Count IV of the complaint. However, the court denied defendants' motion with respect to Karns. Trial on the remaining counts began on January 8, 1996. At the close of the plaintiffs' case, the court granted defendants' motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50. The plaintiffs appealed from that judgment.

On August 26, 1996, while the parties were briefing the appeal from the district court's earlier rulings, the plaintiffs filed in the district court a Federal Rule of Civil Procedure 60(b) motion for postjudgment relief. In that motion, the plaintiffs requested a new trial and that the district judge recuse himself from further proceedings. By order dated April 2, 1997, the district court denied the Rule 60(b) motion. Plaintiffs then filed a timely notice of appeal from that order as well.

## II. ISSUES PRESENTED

In this appeal, the parties raise a variety of contentions, several of which do not warrant detailed discussion. First, we affirm the district court's order denying plaintiff Malick's motion for leave to amend his complaint, which was filed more than ten years after the initiation of this lawsuit. Second, we affirm the district court's denial of plaintiffs' motion to supplement the complaint. Third, we find that the district court did not abuse its discretion in excluding evidence that plaintiffs sought to introduce at trial. Fourth, we deny as premature plaintiffs' motion for attorneys' fees and costs. Fifth, we deny defendants' motion asking this court to award double costs. These five matters we will not discuss any further.

Several of plaintiffs' arguments, however, do warrant further discussion. These include plaintiffs' contentions that: (1) the district court erred by concluding the plaintiffs lacked standing to pursue their RICO claims; (2) the district court erred by granting summary judgment in favor of the defendants on Konstand's state law shareholder derivative claim; (3) the district court erred by granting a directed verdict in favor of the defendants following the close of the plaintiffs' case at trial; and (4) the district court erred in denying the requested postjudgment relief. We will discuss each contention in turn, after we set out the proper standard of review.

## III.  STANDARD OF REVIEW

We review de novo a district court's entry of summary judgment pursuant to Federal Rule of Civil Procedure 56, see, e.g., Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996), which is to say that we apply the same summary judgment standard that bound the district court, see, e.g., Harris v. I.K. Ostrout, 65 F.3d 912, 915 (11th Cir. 1995).

8

Under that standard, summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

The district court granted summary judgment against Konstand on his state law shareholder derivative claim on the basis of his stock pledge, which the court interpreted as divesting Konstand of all of his stock in BCI. In determining whether summary judgment is appropriate on Konstand's state law shareholder derivative claim, therefore, the rules of Florida contract law bind both the district court and this Court. Under Florida law, which we apply here, construction of a contract is ordinarily a question of law for the trial court, so long as the terms of the contract are unambiguous. See Moore v. Morris, 475 So.2d 666, 668 (Fla. 1985). While the existence of ambiguity in a contract is a question of law for the judge to decide, the intent of the parties is an issue of fact. See, e.g., Rosiek Constr. Co. v. Department of Trans., 689 So.2d 1139, 1140 (Fla. Dist. Ct. App. 1997); Segal v. Rhumbline Int'l, Inc., 688 So.2d 397, 399 (Fla. Dist. Ct. App. 1997).

This Court reviews a district court's grant of a directed verdict de novo, applying the same standard that the district court applied in deciding whether to grant a directed verdict. See Hibiscus Assoc. v. Board of Trustees, 50 F.3d 909, 920 (11th Cir. 1995). In determining whether a directed verdict is appropriate, the court must consider the evidence in the light most favorable to the opposing party. See id. The facts and inferences must "so overwhelmingly favor the verdict" that no reasonable juror could reach a contrary decision. See id.

9

Finally, this Court reviews a district court's denial of postjudgment relief under Federal Rule of Civil Procedure 60(b) for abuse of discretion. See Rice v. Ford Motor Co., 88 F.3d 914, 918 (11th Cir. 1996). With regard to plaintiffs' contention that the trial judge should have recused himself, we review a district judge's refusal to recuse himself for abuse of discretion. See Diversified Numismatics, Inc. v. City of Orlando, 949 F.2d 382, 384-85 (11th Cir. 1991).

## IV. THE GRANT OF SUMMARY JUDGMENT ON THE RICO CLAIMS

On August 3, 1993, the district court dismissed all of the plaintiffs' RICO claims, holding that the plaintiffs lacked standing to bring those claims because the defendants' alleged racketeering activities were directed at BCI and BGH, making their individual injuries too indirect to support claims under RICO.

### A. REQUIREMENTS FOR RICO STANDING

A plaintiff may pursue an injury under the RICO statute (and thereby seek treble damages) only if his injury confers RICO standing. The standing provision of RICO provides that "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue . . . ." 18 U.S.C. § 1964(c). This Court has interpreted that provision to include a requirement that the party's injuries be the direct result of the alleged racketeering activity. Therefore, a plaintiff has RICO standing only if his injuries were proximately caused by the RICO violation. See Pelletier v. Zweifel, 921 F.2d 1465, 1499 (11th Cir. 1991) (holding that plaintiff has RICO standing only if "his injury flowed directly from the commission of the predicate acts").

10

In Pelletier, the plaintiff, an investor, alleged that the defendant and an associate conspired to defraud potential investors through the use of the mails by luring intended victims into buying stock in their company with illusory promises of control over the company. See id. at 1500. We held that the plaintiff had standing to bring a RICO claim because, as a target of the defendant's alleged scheme, his injury would have been a direct result of the defendant's substantive RICO violation. See id. Because injury to the solicited investors was the direct result of the alleged activity, such an injury would have been sufficient to confer RICO standing.

The Supreme Court's decision in Holmes v. Securities Investor Protection Corp., 503 U.S. 258, 112 S. Ct. 1311 (1992), is consistent with the RICO standing analysis that we have adopted. In Holmes, some broker-dealers were the targets of an unlawful stock manipulation scheme designed to render them insolvent and unable to pay their customers' claims. The Court concluded that the plaintiffs, customers of these broker-dealers, lacked RICO standing because their injury was "purely contingent on the harm suffered by the broker-dealers." Holmes, 503 U.S. at 268, 112 S. Ct. at 1319. In other words, the plaintiffs lacked standing because the alleged RICO violation was not the "proximate" cause of their injury; there was no "direct relation between the injury asserted and the injurious conduct alleged." Id. at 267, 112 S. Ct. at 1318. The Holmes Court explicitly noted that its causation analysis was the same one that we had set forth in Pelletier. See id. at 266 n.11, 112 S. Ct. at 1316 n.11.

Under Holmes and Pelletier, a party whose injuries result "merely from the misfortunes visited upon a third person by the defendant's acts" lacks standing to pursue a

11

claim under RICO. Holmes, 503 U.S. at 267, 112 S. Ct. at 1318. Application of that principle means that losses suffered by a company's stakeholders as a result of racketeering activity against the company do not give them standing under RICO. RICO standing will not arise solely because one is a shareholder or a limited partner in a company that was the target of the alleged RICO violation. See, e.g., Warner v. Alexander Grant & Co., 828 F.2d 1528, 1530 (11th Cir. 1987) ("It is clear, however, that Warner cannot sue under RICO for damages he sustained derivatively as a shareholder."). Such an injury is too indirect or "derivative" to confer RICO standing.

However, a shareholder derivative lawsuit presents a scenario entirely different from the one where a shareholder sues for his own loss suffered indirectly as a result of racketeering activity against a corporation. The difference is that a shareholder's derivative suit is for the benefit of the corporation and alleges an injury that befalls the corporation directly, instead of an injury to the nominal plaintiff who institutes the suit. The cause of action arises in the corporation itself, rather than in the nominal plaintiff who brings suit, because a shareholder derivative suit is "[a]n action by a shareholder for the purpose of sustaining in his own name a right of action existing in the corporation itself, where corporation would be an appropriate plaintiff." Black's Law Dictionary 1419 (6th ed. 1991) (emphasis added). Because the corporation stands to gain from a shareholder's derivative suit asserting a RICO claim, the shareholder bringing the derivative claim has RICO standing if the racketeering act that forms the basis of the RICO claim was directed at the corporation. See In re American Express Co. Shareholder Litigation, 39 F.3d 395, 400-01 (2d Cir. 1994)

12

(holding that in determining whether plaintiff in shareholder derivative action has RICO standing, courts must look to whether alleged activity was intended to harm corporation). Allowing shareholders to state a RICO claim on behalf of the corporation functions as an important safety valve, because otherwise executives looting a corporation would be insulated from RICO liability as a result of no one having standing to sue them.

## B.  APPLICATION OF THE RICO STANDING REQUIREMENT TO PLAINTIFFS' RICO CLAIMS

### 1.  The Individual Claims

#### a.  Konstand

Konstand contends that he has suffered three distinct injuries that give him RICO standing.  First, he contends that the defendants conspired to unlawfully wrest his shares of BCI stock from him.  Although this alleged injury is direct, it does not constitute a RICO claim that is still viable, because it occurred in 1975, eight years before Konstand filed this lawsuit.  In our previous opinion in this case, we held that Konstand's claims relating to this injury are time-barred.  See Bivens, 906 F.2d at 1555.  Accordingly, this injury cannot be the basis for a viable RICO claim.

Second, Konstand alleges that his status as a pledgor of stock gives him RICO standing.  He points out that a pledgor of stock has a stake in a corporation that transcends that of a mere shareholder, and that difference in stake may allow the pledgor to sue management directly in situations where a shareholder could not.  See Citibank, N.A. v. Data Lease Financial Corp., 828 F.2d 686, 693 (11th Cir. 1987) (citing Empire Life Ins. Co. of

America v. Valdak Corp., 468 F.2d 330, 336 (5th Cir. 1972)).  However, Konstand's status as a pledgor of stock does not give him RICO standing for any viable claims relating to the three injuries he allegedly suffered.  As we have just noted, the statute of limitations bars any claim with respect to the 1975 takeover of BCI. Therefore, whether Konstand's status as a pledgor is sufficient to confer RICO standing is irrelevant to claims arising from that 1975 injury.

At the time of Konstand's second alleged injury, the mismanagement and alleged skimming of revenues from the hotel from 1975 until 1981, he was no longer a pledgor of stock.  By early 1975, UCB had foreclosed on Konstand's stock pledge, buying the stock at a public sale in early 1975.  Therefore, Konstand was not a pledgor at the time that the alleged skimming of assets took place because his pledge already had been "called in."[4] Once UCB foreclosed on the shares that Konstand had pledged he was, at best, similarly situated with other shareholders.   Because Konstand lost his pledgor status once UCB foreclosed on his BCI shares, the stock pledge also cannot confer RICO standing on Konstand's claims related to the mismanagement of the hotel from 1975 until 1981. Therefore, his stock pledge cannot be the basis for any RICO standing.  See Pelletier, 921 F.2d at 1500; Citibank, 828 F.2d at 693.

---

[4]That Konstand may have held additional stock that was not pledged (see Part IV, infra) is irrelevant, because only stock actually pledged could create a stake sufficient to support RICO standing.  Whether or not Konstand pledged all of his holdings in BCI, he was no longer a pledgor once UCB foreclosed on all of the shares that he had pledged.

14

Finally, Konstand contends that because he loaned BCI $105,000, he has RICO standing as a creditor of BCI. He asserts that his status as a creditor allows him to pursue his RICO claims with regard to both the alleged mismanagement of assets and skimming of profits from the hotel during the 1975-1981 period and the allegedly fraudulent sale of the hotel for less than its fair market value in 1981. In support of his position, Konstand refers us to the relatively lenient test for creditor RICO standing that the Second Circuit has adopted. That circuit has held that a creditor will have standing to pursue RICO claims whenever harm to that creditor is "reasonably foreseeable or anticipated as a natural consequence." See GICC Capital Corp. v. Technology Finance Group, 30 F.3d 289, 292-93 (2d Cir. 1994), cert. denied, ___ U.S. ___, 116 S. Ct. 2547 (1996). However, the Second Circuit's broad interpretation of RICO standing is inconsistent with the Supreme Court's analysis in Holmes and with our analysis in Pelletier. As those decisions make clear, the test for RICO standing is whether the alleged injury was directly caused by the RICO violation, not whether such harm was reasonably foreseeable. See Holmes at 268, 112 S. Ct. at 1319; Pelletier, 921 F.2d at 1500.

We do not mean to imply that a creditor can never have RICO standing, because it is possible that a pattern of racketeering could be directed specifically at a corporation's creditors. A creditor will have RICO standing only when his injury passes the directness test laid out in Holmes and Pelletier, which will not be the case if the injury alleged was suffered only as a result of harm to the corporation. See Hamid v. Price Waterhouse, 51 F.3d 1411, 1420 (9th Cir. 1995); Manson v. Stacescu, 11 F.3d 1127, 1130 (2d Cir. 1993); see also

15

<u>Sparling v. Hoffman Constr. Co., Inc.</u>, 864 F.2d 635, 640 (9th Cir. 1988) (holding that creditor lacks RICO standing unless he shows injury other than that shown by shareholders).

Konstand claims that as a creditor, he has RICO standing to pursue the injuries that he suffered as a result of the alleged skimming of profits and the sale of the hotel at below its market value. We believe that Konstand's status as a BCI creditor does not confer RICO standing on his individual claims with regard to the skimming of profits, because that alleged diversion of hotel revenues had too derivative an effect on Konstand as a creditor; the skimming was aimed primarily at the corporation, not at its creditors.

The sale of the hotel allegedly at a price below its market value is a different matter. At the time that BGH sold the Gainesville Hilton, it was in bankruptcy seeking protection from its creditors, including Konstand. As a creditor, Konstand had a direct interest in seeing the hotel sold for as high a price as possible. <u>See</u> 11 U.S.C. § 1104(a) (allowing for appointment of independent trustee to prevent debtor from defrauding creditors). The sale of the hotel for a higher price would have directly benefitted major creditors such as Konstand, because they would have been able to recover a greater percentage of the debts owed to them. In contrast, the sale of the hotel for a higher price would have little impact on the shareholders and the corporation, since the additional funds from the sale would have been used to satisfy creditors instead of going to shareholders. Therefore, the sale of the hotel at a lower price affected creditors in a manner distinct from shareholders, and in a manner sufficiently direct to confer RICO standing on Konstand in his capacity as a creditor. <u>See</u> <u>Bankers Trust Co. v. Rhoades</u>, 859 F.2d 1096, 1100-01 (2d Cir. 1988) (relying in part

16

on defendants' alleged fraudulent transfers to avoid bankruptcy creditors to support RICO standing).

b. Karns and Malick

Karns and Malick rely on their capacities as shareholder and limited partner in BCI and BGH, respectively, to assert their RICO claims. As discussed above, a shareholder's injuries that result from racketeering activity directed toward a corporation are too indirect to sustain a RICO claim. See Pelletier, 921 F.2d at 1500; Warner, 828 F.2d at 1530. The same is true of a limited partner's injuries in the same circumstances. See Whalen v. Carter, 954 F.2d 1087, 1093 (5th Cir. 1992). Accordingly, neither Karns nor Malick has standing to pursue RICO claims for their individual injuries.

2. The Derivative Claims

In addition to their individual claims, Karns, Konstand, and Malick each brought claims on behalf of other entities. Karns and Konstand brought shareholder derivative suits on behalf of BCI, while Malick brought a partnership derivative suit on behalf of BGH. The district court granted summary judgment against the plaintiffs on all of these derivative claims, and the plaintiffs have appealed from that judgment.


a. Karns' and Konstand's Shareholder Derivative Claims

The district court dismissed Konstand's and Karns' claims because it concluded that shareholder derivative suits do not confer RICO standing. Relying on the tripartite analysis that the Fifth Circuit adopted in Whalen v. Carter, 954 F.2d 1087 (5th Cir. 1992), the district

17

court noted that a shareholder derivative suit has three characteristics that normally identify a claim lacking RICO standing: (1) the alleged racketeering activity is directed at the corporation; (2) the injury to shareholders is derived from the injury suffered by the corporation; and (3) the claim accrues in the corporation. Because a shareholder derivative suit satisfies each of those conditions, see id. at 1091, the district court concluded that the injury in such suits is too indirect for the suit to be brought under RICO.

We believe that the Fifth Circuit's Whalen analysis is applicable only where shareholders sue "for the loss in value of their shares," id., at 1091, not where they sue on behalf of the corporation itself to recoup its losses. The Whalen analysis does not bar shareholder derivative suits, which are brought to recover the corporation's losses. Therefore, the district court erred in concluding that plaintiffs bringing a shareholder derivative action lack RICO standing. See Manson v. Stacescu, 11 F.3d 1127, 1132 (2d Cir. 1993) (noting that proximate cause requirement serves judicial economy by forcing shareholders to recover for injuries under RICO by bringing single shareholder derivative claim on behalf of corporation); Warren v. Manufacturers National Bank of Detroit, 759 F.2d 542, 544 (6th Cir. 1985) (RICO action to redress injuries to corporation cannot be maintained by shareholder in own name; must be brought in name of corporation either by corporation or as shareholder derivative suit) (citing Stevens v. Lowder, 643 F.2d 1078, 1080 (5th Cir. Unit B Apr. 1981)). What remains to be decided, however, is whether these plaintiffs have brought a proper shareholder derivative action.

18

In addition to alleging the underlying offense against the corporation, the plaintiff in a shareholder derivative suit must allege that he is a shareholder and must name the corporation as a party to the suit. See, e.g., Fla. Stat. § 607.07401. Konstand and Karns have met all of those requirements. In paragraph one of the complaint, Konstand and Karns both assert that they are bringing claims both "individually and as shareholders of BCI," and they have named BCI as a defendant. Evidence that both sides have presented through affidavits, depositions, and at trial indicates that the alleged sch3emes were directed at BCI and BGH. Accordingly, Karns and Konstand have brought proper shareholder derivative claims, and have RICO standing to pursue claims on behalf of the corporation.

b.      Malick's Partnership Derivative Claim

Malick contends that he has asserted a valid RICO claim through his partnership derivative suit. In 1986, Florida law was amended to allow limited partners to bring derivative suits in the same manner as shareholders. See Fla. Stat. § 620.163. Accordingly, Malick as a limited partner in BGH can assert a derivative claim on behalf of the partnership in the same manner that the shareholders of BCI can assert a derivative claim on behalf of the corporation. As Malick points out, the defendants have consistently maintained that the alleged racketeering scheme targeted BCI and BGH as entities, rather than targeting particular individuals. Malick contends that because his derivative suit recognizes the partnership BGH as the real party in interest, and because the alleged schemes were directed in part at BGH, his partnership derivative claims have RICO standing.

19

The district court dismissed Malick's claim on the grounds that it did not assert a proper partnership derivative claim. Malick failed to name the partnership, BGH, as a party to this action. In a partnership derivative suit, the partnership is an indispensable party. See Liddy v. Urbanek, 707 F.2d 1222, 1224 (11th Cir. 1983) (holding that corporation is an indispensable party in a derivative suit); Lenz v. Associated Inns and Restaurants Co. of America, 833 F. Supp. 362, 378 (S.D.N.Y. 1993) ("Simply put, in a derivative action brought by a limited partner, the limited partnership is an indispensable party.") (interpreting New York and Oklahoma partnership law, both of which are based on Uniform Partnership Act, 6 U.L.A. §§ 1001, 1002, which serves as the model for the Florida statute authorizing such derivative actions). Malick's argument that BGH does not need to be named as a party because the Florida statute authorizing limited partner derivative suits does not expressly require it, see Fla. Stat. §§ 620.163, 620.164, misses the point. Malick was required to name BGH in order to plead a proper derivative action even absent a statutory requirement, because BGH is an indispensable party. Accordingly, while Konstand and Karns have properly asserted shareholder derivative claims, Malick lacks RICO standing because he has failed properly to state a proper partnership derivative claim.[5]

## V. SUMMARY JUDGMENT ON KONSTAND'S SHAREHOLDER DERIVATIVE CLAIM

---

[5]Malick's argument that he has RICO standing because BGH shares BCI's economic fate and Malick is thus suing "double-derivatively" is creative but meritless. Assuming that such a double-derivative action exists, it rests upon the idea that the injury to plaintiffs' corporation results from injuries to another corporation. That type of injury is too attenuated for RICO standing.

20

The district court granted summary judgment against Konstand on Count IV, the state law shareholder derivative claim, after concluding that Konstand lacked standing to bring a shareholder derivative suit because he was no longer a BCI shareholder after UCB foreclosed on Konstand's stock pledge. BCI argues that Konstand pledged all of his stock to secure the UCB loan, and that UCB therefore gained control of all of Konstand's stock when it foreclosed on its loan to BCI. Konstand responds that at the least a genuine issue of fact exists as to whether the agreement pledged all of Konstand's BCI stock. The district court agreed with BCI, finding that the language of the loan agreement unambiguously indicated that Konstand intended to pledge all of his stock to secure the UCB loan.

The pledge agreement by which Konstand pledged his BCI stock to secure the UCB loan provided, in pertinent part:

> Konstand, as security for the repayment of said note under the terms and provisions hereinafter set forth, will pledge all of his shares of stock which he presently owns in Biven's [sic] in the amount of 58.07 shares of stock. . . .

Both sides concede that the language of the agreement is inconsistent with the actual facts, because at the time Konstand signed the agreement in July 1973 he owned 59 shares, not 58.07. The district court dealt with this inconsistency by interpreting the numeral "58.07" as a "scrivener's error" and concluding that Konstand actually had pledged all 59 shares of his BCI stock to UCB to secure the $200,000 loan. As a result, the district court found that when UCB foreclosed on the pledged shares, Konstand lost all 59 of his shares, instead of only 58.07 shares. Without any BCI stock, Konstand lacked the standing to bring a

21

derivative suit. Accordingly, the court concluded that summary judgment against Konstand on Count IV was proper.

We are not prepared to say that the district court's interpretation of the pledge agreement is an unreasonable one. The parties could have intended the pledge to extend to all of Konstand's stock, could have screwed up the number somehow, and everyone could have overlooked the error before the agreement was signed (and apparently immediately thereafter, as well). That is possible. However, it is also possible that the parties intended the pledge of "58.07 shares of stock" to mean exactly that, which is why they put that number in the agreement, and the error was in the reference to "all of his shares." From the language of the agreement alone we do not know why the parties would have wanted the pledge to cover such an odd number of shares. In one way the oddness of that number of shares weighs in favor of finding that the mistake is in the number, but it also weighs the other way. Surely, such an odd number would have stood out to the parties, just as it does to us, and would have caused them to double check to ensure that is what they intended, that it was the precise number of shares Konstand was pledging.

We are left with the conclusion that there are two reasonable interpretations of the pledge agreement's language, which is to say two reasonable explanations for which part of the agreement was not intended: the 58.07 number, or the "all of his shares" language. "Ambiguous" provisions are those "susceptible of interpretation in opposite ways" or "reasonably or fairly susceptible to different constructions." Friedman v. Virginia Metal Prods. Corp., 56 So.2d 515, 517 (Fla.1952); see The Ins. Co. v. Neumann, 634 So.2d 726,

729 (Fla. Dist. Ct. App. 1994); Hancock v. Brumer, Cohen, Logan, Kandell & Kaufman, 580 So.2d 782, 784 (Fla. Dist. Ct. App. 1991). Because more than one reasonable interpretation of the pledge agreement exists, it is ambiguous with respect to the number of shares that Konstand pledged, whether it was 58.07 or all 59 shares.

Konstand contends that if the agreement is ambiguous, then summary judgment against him is inappropriate because all ambiguities must be construed against the drafter of the agreement, see, e.g., McGregor v. Board of Comm'rs of Palm Beach County., 956 F.2d 1017, 1022 (11th Cir. 1992); State ex rel. Guardian Credit Indemnity Corp. v. Harrison, 74 So.2d 371, 378 (Fla. 1954), and UCB was the drafter. However, that is something of a fallback canon, and the foremost goal of contract construction is to give effect to the intent of the parties. See, e.g., Hurt v. Leatherby Ins. Co., 380 So.2d 432, 434 (Fla. 1980). Therefore, in order for summary judgment to have been proper, no genuine material issue of fact must exist with regard to the parties' intent.

Whether the parties intended for Konstand to pledge all 59 of his shares of BCI stock is a question of fact. In this case, evidence exists to support both sides' positions. Konstand points to the express mention of 58.07 shares in the agreement and to his own deposition testimony stating that he reached a bargained for agreement with UCB which would allow him to keep less than one share in order to remain a minority shareholder. Konstand notes that at the foreclosure sale in 1975, UCB could only claim to have bought 58.07 shares of BCI stock, not 59 as it now claims to own, because UCB alleges that at the time that the parties entered into the pledge agreement it believed Konstand owned only 58.07 shares of

23

stock. The conduct of the parties to an agreement is an excellent indicator of intent. See Hibiscus Assoc. v. Board of Trustees, 50 F.3d 909, 919 (11th Cir. 1995) (interpreting Florida contract law). Konstand also argues that UCB has continued to recognize Konstand as a minority shareholder in BCI for twenty years. He points out that the minutes of BCI stockholder meetings identify him as a minority shareholder and the defendants failed to deny in their answer to the complaint his allegation that he is a minority shareholder in BCI. Defendants, on the other hand, contend that there is a lack of additional evidence corroborating Konstand's story and that a letter written by Konstand contemporaneously with the loan agreement, in which Konstand agrees to pledge all his BCI stock to secure the loan, evidences that Konstand intended to pledge all of his stock.

The net result is that a genuine issue of fact exists with respect to the parties' intent in regard to the pledge agreement. The district court should not have decided whether the pledge of 58.07 shares of stock was a "scrivener's error," because that is a question of fact to be decided by a jury. Therefore, the district court's grant of summary judgment for the defendants on Konstand's state law shareholder derivative claim is due to be reversed.

## VI. THE DIRECTED VERDICT ON COUNTS IV AND V

At the start of the trial in this case, the district court had already granted summary judgment against most of the plaintiffs on most of their claims. As a result, the only claims that proceeded to trial were Karns' shareholder derivative claim under Count IV of the complaint, and the civil conspiracy claim of Konstand, Karns, and Malick in Count V of the

24

complaint. At the close of the plaintiffs' case, the district court directed a verdict in favor of the defendants on all of those claims.

### 1. Karns' Shareholder Derivative Claim (Count IV)

At trial, Karns presented no evidence that he was a BCI shareholder. The Florida statute authorizing derivative suits makes it clear that ownership of stock at the time of the alleged unlawful activity is a necessary element of the claim. See Fla. Stat. § 607.07401(1) ("A person may not commence a proceeding in the right of a domestic or foreign corporation unless the person was a shareholder of the corporation when the transaction complained of occurred."). Therefore, proof of Karns' status as a shareholder was an essential element of his shareholder derivative claim. See Schilling v. Belcher, 582 F.2d 995, 996 (5th Cir. 1978). Given his failure to offer any proof of that, the district court properly granted a directed verdict against Karns on his shareholder derivative claim.

### 2. Konstand, Karns, and Malick's Civil Conspiracy Claims (Count V)

At trial, plaintiffs sought to demonstrate that the defendants conspired to defraud the hotel of profits from Winnie's, a popular disco club at the hotel. Plaintiffs contended that defendants were skimming revenues from cover charges and the drink prices that patrons paid, and that the defendants reported much lower revenue figures than the club actually made. Although the plaintiffs presented circumstantial evidence showing that something suspicious was going on at Winnie's, that showing of "suspiciousness" was not enough to save their conspiracy claims. Taken in the light most favorable to the plaintiffs, the evidence adduced at trial showed that during the disco craze of the late 1970's, Winnie's was one of

25

the most popular dance clubs in Gainesville. It also showed that Winnie's had a five dollar cover charge and a two-to-five dollar range for drinks. Finally, the evidence showed that despite prices and crowd sizes similar to those of its competitors, Winnie's reported substantially lower revenues than its competitors.

An action for civil conspiracy ordinarily requires proof of an agreement between two or more people to achieve an illegal objective, an overt act in furtherance of that illegal objective, and a resulting injury to the plaintiff. See Ambrister v. Roland Int'l Corp., 667 F. Supp. 802, 809 (M.D. Fla. 1987). None of the evidence plaintiffs adduced at trial supports an inference that an agreement existed among the defendants to defraud the hotel of profits. Furthermore, the plaintiffs' evidence failed to tie the defendants to the alleged skimming., and that failure to connect the alleged wrongdoing to the alleged wrongdoers is fatal to their civil conspiracy claim. See Menendez v. Beech Acceptance Corp., 521 So.2d 178, 180 (Fla. Dist. Ct. App. 1988) (granting summary judgment where plaintiff failed to establish connection between wrongdoing and alleged wrongdoer). Accordingly, the district court's grant of a directed verdict on the civil conspiracy count was proper.

## VII. THE DISTRICT COURT'S DENIAL OF POSTJUDGMENT RELIEF

While the parties were briefing this appeal, plaintiffs filed a motion for postjudgment relief requesting a new trial and the disqualification of Judge Moore. The district court entered an order denying the motion. On appeal, plaintiffs contend that Judge Moore abused his discretion by refusing to recuse himself.

26

Plaintiffs argue that 28 U.S.C. § 455(a) requires the disqualification of Judge Moore. It provides that:

> Any justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.

Id. The test for determining whether a judge's impartiality might reasonably be questioned is an objective one, and requires asking whether a disinterested observer fully informed of the facts would entertain a significant doubt as to the judge's impartiality. See Diversified Numismatics, 949 F.2d at 385; Parker v. Connors Steel Co., 855 F.2d 1510, 1524 (11th Cir. 1988). In their motion before the district court and on appeal, plaintiffs identify two sources of partiality they claim require a new trial and the recusal of Judge Moore.

1.      The Law Clerk Issue

Plaintiffs' first contention is that because the defendants' lead counsel was a former law clerk, the judge had an impermissible conflict of interest. Three months before trial, plaintiffs learned that the defendants' lead counsel, Paul Perez, had clerked for Judge Moore during the 1984-85 term. Perez had become the lead defense counsel after leaving the U.S. Attorney's office in 1993. This case had been filed in 1983, which means Perez was a clerk for Judge Moore while this case was before him. Furthermore, this case was one of the cases for which Perez was responsible during his clerkship, and many of the defendants' motions to dismiss were filed and pending while Perez was clerking for Judge Moore. Judge Moore did not rule on those motions until two years later, at which time Perez was no longer his law clerk.

The Middle District of Florida has expressly incorporated Florida's ethical rules into its local rules. See M.D.Fla. R. 2.04(c). Florida Rule of Professional Conduct 4-1.12(e) prohibits a former law clerk from participating as an advocate in any case in which he had substantial participation as a law clerk, unless all of the parties consent after full disclosure. It is not clear, however, whether Perez had "substantial involvement" with this case. Perez was the law clerk to whom the case was assigned, and motions to dismiss were filed during his tenure as a clerk, so it is possible that he was privy to Judge Moore's thoughts concerning the case. On the other hand, the motions to dismiss were not decided until after Perez had moved on to another job, and in his sworn affidavit Perez states that he had little involvement with the case.

The former Fifth Circuit has held that when a former law clerk who has been exposed to the judge's "innermost thoughts" concerning a particular case becomes part of the counsel team for a party to that litigation, the judge must recuse himself. See Fredonia Broadcasting Corp. v. RCA Corp., 569 F.2d 251, 255 (5th Cir. 1978). However, it is not necessary to decide whether Perez was exposed to Judge Moore's "innermost thoughts" so as to necessitate Judge Moore's recusal. Even if § 455 ordinarily would require recusal in this situation, plaintiffs have waived this issue. Although a literal reading of § 455 places the duty to recognize the conflict on the judge, this Court has held that a motion to disqualify must be timely. See, e.g., United States v. Slay, 714 F.2d 1093, 1094 (11th Cir. 1983). In Slay, the defendant became aware of a potential conflict warranting recusal under § 455. Nevertheless, the defendant waited until after the judge ruled unfavorably on his motion to

28

suppress before raising the § 455 issue. This Court refused to consider the recusal issue, holding that the defendant had waived the issue by not raising it at the first available opportunity.

Plaintiffs' attorneys were aware a full three months before this case went to trial that Judge Moore had employed Perez as a law clerk while the case was pending before him. They recognized the recusal issue from the start of that three-month period. Yet they made a strategic decision not to raise the issue until they saw how the trial came out. They explain that they decided to keep this issue in their pocket because the case was twelve years old, the remaining plaintiffs were seventy years old, and they thought that they would prevail at trial anyway. In other words, they made a carefully thought out, coldly calculated, eyes open decision not to raise the issue and instead to gamble on winning anyway. The recusal provision was intended to be a shield, not a sword. An issue involving recusal cannot be used as an insurance policy to be cashed in if a party's assessment of his litigation risks turns out to be off and a loss occurs. Plaintiffs waived the issue.[6]

2.     The Bias Issue

Plaintiffs also contend that Judge Moore's rulings and comments throughout the case illustrate a lack of impartiality that warrants a new trial and his disqualification from participation in further proceedings. They assert that, at trial, Judge Moore showed

---

[6]Of course, we do not condone Perez's apparent failure to disclose fully and in a timely fashion his role in connection with the case as a former law clerk for Judge Moore. Nor do we mean to intimate any view on whether his failure to do so might be subject to sanction in another forum.

impermissible bias against the plaintiffs, often acting as advocate for the defense in front of the jury.[7]  Plaintiffs also contend that Judge Moore showed antipathy towards "Miami lawyers."[8]

Bias sufficient to disqualify a judge normally must stem from extrajudicial sources and must be focused against a party to the proceeding.  See Hamm v. Board of Regents, 708 F.2d 647, 651 (11th Cir. 1983).  None of the statements that plaintiffs have offered meet that standard.  While the negative comments about "Miami lawyers" may be inappropriate, they do not require recusal.  Cf. Philips v. Joint Legislative Com., 637 F.2d 1014, 1020 (5th Cir. Unit A Feb. 1981) (holding recusal not necessary despite improper remarks to parties in previous cases).  A party may establish bias sufficient to disqualify a judge by demonstrating "such pervasive bias and prejudice that it constitutes bias against a party."  Id.  After reviewing the trial record, we conclude that Judge Moore's comments at trial fail even to approach that level.  Therefore, he did not abuse his discretion in refusing to recuse himself from further proceedings.

---

[7]When plaintiffs' counsel attempted to inquire about a former bank employee's statement that the hotel mortgage was "in an amount far in excess of the value of the hotel," Judge Moore interjected, stating, "I don't think he said 'far in excess.'" Although plaintiffs point to other comments that Judge Moore made during the trial, such as his statement, "Counsel, we don't need all of this background," none of these comments reasonably could be construed as indicating to the jury how they should view the evidence. Therefore, we fail to see how making the comments amounted to acting as an advocate.

[8]The most critical statement that Judge Moore made at trial occurred when he admonished plaintiffs' counsel for referring to Perez as the "bank's lawyer."  Judge Moore stated, "[Y]ou sure remind me of my days in Broward County fifteen years ago when the Miami lawyers came up there.  I don't appreciate snide remarks that are being made. . . ."

30

## VII. CONCLUSION

We summarize briefly our holdings in this case. First, with respect to the district court's order granting defendants summary judgment on all of the plaintiffs' RICO claims on standing grounds, we affirm in part and vacate and remand in part. Specifically, we affirm with respect to Malick, in both his individual and representative capacities; on remand, he will have no RICO claims to pursue. We affirm with respect to Karns in his individual capacity, but vacate and remand with respect to his shareholder derivative suit, the only RICO claim that he may pursue on remand. Finally, we affirm with respect to Konstand's individual claims as a shareholder and stock pledgor, but we vacate and remand Konstand's individual RICO claims insofar as they are based on his status as a BCI creditor injured by the sale of the hotel for less than its fair market value. We also vacate and remand with respect to Konstand's shareholder derivative suit under RICO. On remand, Konstand may pursue both his shareholder derivative claim and his claim as a creditor with respect to the allegedly fraudulent sale of the hotel in 1981 under the RICO statute.

Second, we affirm the district court's denial of Malick's motion for leave to amend and the denial of plaintiffs' motion to supplement the complaint. Third, we vacate and remand the district court's entry of summary judgment on Konstand's state law shareholder derivative claim. Fourth, we find no reversible error in the district court's evidentiary rulings at trial. Fifth, we affirm the district court's directed verdict on the claims tried under Counts IV and V of the complaint. Sixth, we affirm the district court's denial of postjudgment relief,

31

including recusal from future proceedings. Seventh, we deny as premature plaintiffs' motion for costs and attorneys' fees. Finally, we deny defendants' motion for costs and damages.

AFFIRMED in part; VACATED and REMANDED in part.