PER CURIAM.
This appeal stems from some homeowners’ claims that their homeowners’ association acted outside the parameters of the community’s governing documents in levying an assessment against only a particular class of homeowner and in adopting the community’s budgets. The trial judge entered final summary judgment in favor of the Association, finding that the actions of the Association were authorized. We disagree and reverse.
Rainberry Bay is a residential community consisting of a total of 901 units. Five hundred sixty-five of these units are governed by the Rainberry Bay Homes Association. Of this 565, 357 units are zero lot line properties, 137 of which have atriums; 140 are detached homes; and 68 are estate homes. The distinction between the three is the size of the lots.
The plaintiffs/appellants are owners of zero lot line homes. In 1996, it was discovered that some of the zero lot line homes with atriums had sustained water damage to the atrium walls. The Association contracted to have the atrium homes inspected and, where necessary, repaired or rebuilt at a total cost of approximately $578,000, paid from Association funds. Thereafter, the 1999 budget was adopted. According to the plaintiffs, the 1999 budget was really two budgets: one for the zero lot line owners and another for the detached and estate owners. The budget reflected that the Board (1) paid the $578,000 bill for the atrium wall repairs/replacements by depleting the zero lot line reserves and borrowing $282,394 from the detached and estate reserves and (2) levied a $75 per quarter assessment against only the zero lot line owners to repay the $282,394.
The plaintiffs/appellants filed suit against the Association, arguing that, under the governing documents, the Association did not have the authority to levy the $75 assessment against only the zero lot line owners but not the detached and estate owners (count I) and did not have the authority to adopt two separate budgets, disparately assessing the property owners for items other than maintenance costs (count II). The trial court sided with the *401 Association and the homeowners have appealed.
The community’s governing documents provide in relevant part:
ARTICLE IV
Homes Association-Covenant for Maintenance Assessment
Section 1 .... each Owner ... shall be deemed to covenant and agree to pay to the Homes Association assessments for maintenance as provided in Section 3 hereof; ....
The assessments ... shall be imposed equally on all Zero-Lot Line Lots, equally on all Detached Lots, and equally on all Estates Lots. However, the assessments upon the Zero Lot Line Lots, the Detached Lots, and the Estates Lots, need not be equal to each other. The Homes Association, it [sic] its discretion, may distinguish between the assessments based on the estimated difference in maintenance costs of the Zero Lot Line Lots, the Detached Lots, and the Estates Lots.
Section 2. Purpose of Assessments. The assessments levied by the Homes Association shall be used exclusively for exterior maintenance as provided in Section 3 hereof, for payment to the Master Association as hereinafter referred to, or to promote the health, safety, welfare and recreational opportunities of the Members of the Homes Association and their families....
Section 3. Exterior Maintenance. The Homes Association shall provide exterior maintenance for each building ... as follows:
(a)paint, caulk, repair, replace and care for roofs and roof ventilators, gutters and downspouts, exterior wood, wood composition, stucco and “stone” building surfaces and fences.
(b) maintain the landscaping, ..., sprinkler heads, walks, driveways and other exterior improvements....
(c) removal of mildew stain from roofs and sidewalks.
(d) provide termite control....
[[Image here]]
It is the intention hereof that the Homes Association shall perform only routine maintenance as described in this Section 3.
... The responsibility of the Association is limited to the maintenance specified in this Article. For example: in the event of a roof leak, the Association shall not be responsible for repairs to the interior of the home or for damage to contents.
First, appellants argue that the trial court erred in entering summary judgment in favor of the Association on count I because unequal assessments are authorized only for the maintenance obligations detailed in Article IV, section 3 and much of the work performed was not within the' scope of the Association’s maintenance obligations. The Association, on the other hand, contends that the plain language of the documents permitted the Association to perform the work and to assess only the zero lot line owners for the cost. “Construction of a contract is ordinarily a question of law for the trial court provided that the terms used are unequivocal, clear, undisputed, and not subject to conflicting inferences.” Segal v. Rhumbline Int'l, Inc., 688 So.2d 397, 398 (Fla. 4th DCA 1997)(on rehearing). And, on appeal, the trial court’s construction of a contract is subject to de novo review. See Limehouse v. Smith, 797 So.2d 15,17 (Fla. 4th DCA 2001); Royal Oak Landing Homeoumer’s Ass’n v. Pelletier, 620 So.2d 786, 788 (Fla. 4th DCA 1993).
*402 We agree that the language of the declaration is unambiguous. Unlike the trial judge, however, we find that the plain language of the community’s documents does not categorically cover all of the atrium wall repairs/replacements at issue. First, section 1 states that the owner agrees to pay the Association for “assessments for maintenance as provided in Section 3.” (emphasis added). This same section goes on to state that assessments must be equal among all zero lot line owners, equal among all detached lot owners, and equal among all estate lot owners. As between the three classes of property owners, however, the assessments need not be equal and the Association “may distinguish between the assessments based on the estimated differences in maintenance costs of the Zero Lot Line Lots, the Detached Lots, and the Estates Lots.” (emphasis added). Section 3 defines the scope of the maintenance that the Association is authorized to perform and to assess the homeowners for. Of particular importance to this appeal is the language in subsection (a): “The Homes Association shall provide exterior maintenance for each building within The Properties as follows: (a) paint, caulk, repair, replace and care for ... exterior wood, wood composition, stucco and ‘stone’ building surfaces.” The word “surface” is defined as “[t]he outer or the topmost boundary of an object,” “[a] material layer constituting such boundary,” “[t]he superficial or outward appearance of anything as distinguished from inner substance or matter.” The AMERICAN Heritage Dictionary of the English Language 1294 (1981). And, in addition to the “surfaces” limitation, the Association’s maintenance obligations are further restricted to “only routine maintenance as described in this Section 3.” (emphasis added).
The work orders filed in support of the Association’s motion for summary judgment, reflect that the nature of the repairs/replacements varied widely. For example, in some units, “cracked or excess” cement was removed, cracks were sealed, and special “elastomeric” paint was applied to waterproof the atrium wall. In others, “inspection holes” were cut into the atrium wall, and, after finding no interior damage, the holes were repaired and a “new metal cap” installed on the atrium wall to prevent future water damage for a total cost of $785. In units where water damage was discovered during the inspection, the repairs included, for example, rebuilding the atrium wall, removing damaged baseboards under the living room window, removing a section of water damaged drywall under the living room window, and installing new drywall for a total cost of $16,519. In still another unit, the repair/replacement included replacement of “the main support beam for the roof and corner of house,” removal of section of stucco above garage door, removal and installation of drywall in a section of garage, and replacement of rotted fascia boards over sliding glass doors. We cannot agree with the trial court’s conclusion that all of the work done, as reflected in the work orders, falls within the scope of the “maintenance” that the documents authorize the Association to perform and levy assessments for. While placing a cap, sealant or elastomeric paint on the atrium wall may be characterized as “repairing], replacing] ... exterior ... building surfaces” and “routine maintenance,” replacing drywall in the garage, for example, clearly cannot. Consequently, we reverse the summary judgment on count I and remand for further proceedings consistent with this opinion.
As for count II, we likewise agree that the Association failed to demonstrate entitlement to summary judgment. In count II, among other things, the plaintiffs alleged (1) that past budgets filed by the *403 Association demonstrated that it was assessing zero- lot line owners differently from detached and estate owners foritems other than maintenance costs and (2) that this unequal treatment was not authorized by the documents, seeking to have the court require compliance with the documents. Section 1 addresses the equality of the assessments among the classes of property owners, authorizing a disparity for “maintenance costs.” A review of the community’s budgets reflects that, at a minimum, there are disputed issues of genuine fact regarding whether the zero lot line owners are being assessed differently than the detached and estate owners for items other than maintenance as defined in section 3. Accordingly, we reverse the summary judgment on count II as well and, again, remand for further proceedings.
REVERSED and REMANDED.
STEVENSON, SHAHOOD and MAY, JJ., concur.