841 So.2d 496 (2003)
SUNHOUSE CONSTRUCTION, INC., Appellant,
v.
AMWEST SURETY INSURANCE COMPANY and Consolidated Techniques, Inc., Appellees.
No. 3D01-2975.
District Court of Appeal of Florida, Third District.
February 12, 2003.
Rehearing Denied April 4, 2003.
*497 Sterns Weaver Miller Weissler Alhadeff & Sitterson, and Eugene Stearns and Joy Spillis Lundeen and Alan H. Fein and Anastasia I. Kokotis, for appellant.
Carlton Fields, and Bruce Charles King, for appellees.
Before LEVY, SHEVIN and RAMIREZ, JJ.
SHEVIN, Judge.
This appeal arises out of a dispute between a Contractor ("Sunhouse") and a Subcontractor ("CTI") on work performed at an elementary school in Miami-Dade County.
Sunhouse entered into a design-build contract with the Dade-County School Board for construction and renovation work on the J.G. Dupuis Elementary School (the "Project"). Following negotiations and numerous revisions to the design plans, Sunhouse entered into a Subcontract with CTI who agreed to provide the electrical work on the project for $800,000.
CTI left the project in August, 1997 before final completion but after the School Board issued a certificate of completion in June, 1997. CTI acknowledges that they left before final completion but argues they did so because Sunhouse refused to pay them the full amount of the Subcontract. CTI alleges that they had only been paid $724,890 of the $800,000 owed and further alleges that they were owed an additional $176,144 for extra work performed at the direction of Sunhouse.
Sunhouse alleges that the "additional" work performed was within the scope of the Subcontract and that as a result of CTI'S abandoning the project, Sunhouse was forced to hire replacement subcontractors at a cost in excess of $100,000.
Sunhouse filed its complaint against CTI and its Surety ("Amwest") seeking to recover amounts expended by Sunhouse to complete and correct the work on the project. CTI filed its answer, affirmative defenses and counterclaim for breach of contract to recover the Subcontract price.
In a non-jury trial, the trial judge entered an order awarding CTI $196,104.33 plus $66,682.09 in prejudgment interest.
It is undisputed that CTI abandoned the job, and that Sunhouse paid replacement contractors in excess of the amount remaining on the Subcontract to complete the work. Sunhouse alleges I) that CTI was in breach of the Subcontract when it abandoned the project and II) the work *498 done by the replacement subcontractors was part of the original Subcontract between Sunhouse and CTI and was not "additional" and/or "extra" work. We agree.

I.
CTI has admitted that it did not complete performance of its Subcontract. CTI contracted with Sunhouse to provide a "complete electrical package." This included, among other things, "[a] New Addressable Fire Alarm System ... [and the] certification of the Fire Alarm System," which were part of the Project Design Criteria and CTI's scope of work as set forth in "Exhibit B" of the Subcontract. Sunhouse's payment to replacement contractors to complete and/or correct the items relating to the fire alarm wiring alone exceeded the Subcontract balance. Indeed, determining and certifying that the fire alarm wires were correctly labeled required over eighty visits from completion contractors and cost Sunhouse nearly $80,000.
CTI abandoned the Project without paying its subcontractors and without providing Sunhouse with the As-Built drawings or warranties, which were explicitly required by the Subcontract as a condition of completion. Because the school was due to open within months, Sunhouse had no choice but to hire replacement subcontractors to correct and complete CTI's work, as well as pay CTI's subcontractors to keep them from abandoning the Project. Sunhouse incurred out-of-pocket expenses in excess of $100,000.
We hold that CTI was in breach of the Subcontract and was not entitled to payment because Sunhouse was forced to expend funds over and above the contract price in order to complete the Project. See Cheezem Dev't Corp. v. Intracoastal Sales & Serv., Inc., 336 So.2d 1210, 1212 (Fla. 2nd DCA 1976).
Even if we were to assume, for the sake of argument, that CTI was entitled to the balance under the Subcontract, after taking into account the amount of money Sunhouse expended, CTI would recover nothing, and in fact, would owe money to Sunhouse for the costs of completion. Id. at 1212; see also Lockhart v. Worsham, 508 So.2d 411 (Fla. 1st DCA 1987) (proper measure of damages is reasonable cost of making work conform to the contract); Vanater v. Tom Lilly Constr., 483 So.2d 506, 508 (Fla. 4th DCA 1986) (court found that contractor was liable for the full cost of replacing particle board shelves where contract called for wood); Bankers & Shippers Ins. Co. of New York v. AIA Installation Indus., Inc., et al., 390 So.2d 734, 740 (Fla. 4th DCA 1980) (court held that contractor was liable for full cost of replacing a roof that did not meet specification); American Motor Inns Florida, Inc. v. Bell Elec. Co., 260 So.2d 276 (Fla. 4th DCA 1972) (court recognized that an owner should have been allowed a credit for work done in correcting defective workmanship).

II.
In the instant case, not only was CTI awarded the full contract price, it was awarded over $100,000 for "extra work" CTI alleged it performed which they claimed was "outside the scope" of the Subcontract.
The trial court found that much of the work done by CTI was outside the scope of the Design Criteria and/or was omitted from the plans and specifically excluded from the contract. We disagree. On appeal, the trial court's construction of a contract is subject to de novo review. Argoff v. Rainberry Bay Homes Ass'n, Inc., 828 So.2d 399 (Fla. 4th DCA 2002).
In this case, CTI entered into a Subcontract under which it agreed to provide an electrical package in accordance with the *499 provisions of the Subcontract and the Plans and Specifications as prepared by the Architect. CTI further agreed to perform its work in accordance with the Agreement between Sunhouse and the Dade County School Board as well as all Federal, State, and Local Ordinances.
Pursuant to Article VIII of the Subcontract:
The work included in this Agreement is to be done under the direction and to the satisfaction of Sunhouse, the Architect and the Owner, and the reasonable and good faith decision of the said Architect as to the true construction and meaning of the Plans and Specifications shall be final. Sunhouse will furnish to the Subcontractor such additional information and Plans as may be prepared by the Architect to further describe the Work to be performed by the Subcontractor and the Subcontractor shall conform to and abide by same insofar as they are consistent with the purpose and intent of the Plans and Specification[s]....
What this means, in simple terms, is that the Plans and/or "scope" of the contract could conceivably change, and as long as those changes were reasonable and consistent with the purpose and intent of the Subcontract, they could not be disputed and became incorporated into the contract.
No plans existed when CTI submitted its letter of intent to perform all electrical work specified in the Design Criteria and only preliminary plans existed when CTI submitted its bid for the Project's electrical work. Most importantly, in executing the Subcontract with Sunhouse, CTI agreed that if and when additional Plans where completed during the construction process, it was obligated to conform its work to those plans consistent with the Subcontract.
Approximately one month after the Subcontract was signed by the parties, the final drawings issued. Shortly thereafter, CTI began requesting numerous change orders claiming the scope of the work had changed. Months passed, and in order to resolve the ongoing problem and settle any differences between the May and June drawings, Sunhouse issued "Change Order Number 2," approving any and all change orders dated prior to October 15, 1996. By its terms, Change Order 2 "encompasse[d] any and all modifications or alterations to the original drawings as stated in the Subcontract to the current 06.10.96 [c]onstruction issue plans...." In the trial court's Findings of Fact and Conclusions of Law, the court stated that by issuing the Change Order, Sunhouse "set the stage for [C]TI to properly disavow much of the responsibility for items that [Sunhouse] expected CTI to complete...." We disagree. Change Order 2 was issued in good faith and in the interest of maintaining a healthy business relationship, and did nothing to alter the terms of the Subcontract.
It is the opinion of this court that the trial court failed to fully understand the agreement between the parties, and the essence of design-build construction. Where a trial court's determinations are not grounded in competent substantial evidence, a reversal is warranted. See Randy Int'l, Ltd. v. American Excess Corp., 501 So.2d 667 (Fla. 3d DCA 1987) (when a trial court's findings are unsupported by competent substantial evidence, it is the appellate court's duty to reverse); Design Eng'g Corp. of Am. v. Pan Aviation, Inc. 448 So.2d 1112 (Fla. 3d DCA 1984); Hull v. Miami Shores Village, 435 So.2d 868 (Fla. 3d DCA 1983).
In its findings of fact and conclusions of law, the court below stated that "the court is unable to separate from the work orders and change orders what was in the plans and what was not," but nevertheless allowed CTI to recover on all of its change *500 orders for "extra work" performed totaling over $100,000.
Conversely, the court found that Sunhouse was entitled to a setoff for the cost to correct the fire alarm wiring, which CTI failed to color code. However, because the court could not determine how much of the work related to pre-existing wiring which CTI did not have to color code, the court held that Sunhouse had not carried its burden. Likewise, the trial court found that "the billing of the `completion contractors' was [in]sufficient to determine what was in the contract or plans and what was not," and as a result rewarded Sunhouse nothing.
If the lower court's judgment is allowed to stand, Sunhouse will be forced to pay CTI in excess of $200,000 when Sunhouse has already paid over 1 million dollars for an electrical package CTI promised to provide for $800,000. Accordingly, because there is no competent and substantial evidence to support the judgment in this case said judgment must be vacated.
Reversed and remanded with directions consistent with this opinion.